J-A05011-22 & J-A05012-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1210 MDA 2021 |

Appeal from the Decree Entered August 18, 2021
In the Court of Common Pleas of Berks County Orphans' Court
at No(s): 87410

| | | |
|---|---|---|
| IN THE INT. OF: J.J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: G.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1211 MDA 2021 |

Appeal from the Decree Entered August 18, 2021
In the Court of Common Pleas of Berks County Orphans' Court
at No(s): 87410

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                **FILED: MARCH 24, 2022**

J.T. ("Father") and G.P. ("Mother") appeal from the decrees entered on

August 18, 2021, which involuntarily terminated their parental rights to J.J.T.

_____

[*] Former Justice specially assigned to the Superior Court.

("Child"), their minor son born in November 2019.[1]  After review, we affirm the decrees.

We summarize the relevant facts and procedural history as follows. Father and Mother are in a relationship.  They are unmarried.  Although both share children with other partners, Child is their first child together.  Father and Mother's involvement with Berks County Children and Youth Services ("BCCYS" or "agency") predates Child's birth.  BCCYS was involved with Father since 2006 due to Father's "unstable housing, domestic violence, and substance abuse."  N.T., 6/21/21, at 158.  BCCYS was involved with Mother since 2014 "regarding concerns of inappropriate parenting, lack of supervision, unstable housing, truancy, domestic violence, medical neglect, unstable mental health, and substance abuse."  *Id.*  Father and Mother do not have custody of any of Child's older half-siblings.[2]  In fact, following a dependency case, the court involuntarily terminated Mother's parental rights to Child's half-sister six months before Child was born.  N.T., 6/21/21, at 158.

_____

[1] Father's appeal was docketed at 1210 MDA 2021.  Mother's appeal was docketed at 1211 MDA 2021.  Because both appeals are assigned to this panel and involve overlapping facts and the same child, hearing, and orphans' court opinion, we address both cases in one memorandum.

[2] Father is the parent of seven children besides Child.  N.T., 6/21/21, at 137. One is deceased and the other six live with their mothers.  *Id.*  Mother is the parent of five children besides Child: two children are being raised by their godmother, one child is being raised by her grandmother, one child was adopted, and one child is deceased.  *Id.* at 125, 133.

Mother received little prenatal care during her pregnancy with Child. Despite having a sexually transmitted infection that was potentially transmissible during childbirth, Mother missed her last treatment. Shortly after Child was born, the hospital admitted Child to the neonatal intensive care unit ("NICU") to treat him for the infection. This treatment was successful, and the hospital discharged Child from the NICU on November 24, 2019. N.T., 6/21/21, at 205 (Exhibit 5); *id.* at 190 (Exhibit 1).

That same day, BCCYS sought and obtained an emergency custody authorization to remove Child from Father and Mother's care. The emergency custody authorization was based on the parents' significant history with the agency and indications that their current circumstances were unstable. *See* N.T., 6/21/21, at 197-98 (Exhibit 2). BCCYS initially placed Child with kin, but Child moved to a foster home several months later. *Id.* at 159 and 160.

On December 4, 2019, the juvenile court adjudicated Child dependent pursuant to Sections 6302(1) and (10) of the Juvenile Act.[3] It found dependency based upon clear and convincing evidence of inappropriate

_____

[3] *See* 42 Pa.C.S.A. § 6302(1) (defining a dependent child as one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals"); 42 Pa.C.S.A. § 6302(10) (defining a dependent child as one "born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S.A. § 2511 . . . within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child").

parenting, lack of supervision, unstable housing, truancy, domestic violence,[4] medical neglect, unstable mental health, and substance abuse. N.T., 6/21/21, at 202 (Exhibit 5). It also found aggravated circumstances against Mother based upon the recent termination of parental rights with respect to Child's half-sibling, but it ordered BCCYS to provide reasonable efforts to Mother. *Id.* at 208 (Exhibit 6).

The juvenile court tasked Father and Mother with addressing areas of instability in their lives. Specifically, it ordered Father and Mother to cooperate with parenting education; submit to evaluations for mental health, drug and alcohol, and domestic violence, and any recommended treatment; submit to random urinalysis; engage in casework sessions with BCCYS's service providers; "[e]stablish[] and maintain[] stable and appropriate housing and

---

[4] This history included, *inter alia*, seven temporary protection from abuse ("PFA") orders against Father obtained by Father's former partners spanning 2005 to 2017. N.T., 6/21/21, at 192 (Exhibit 1); *id.* at 205 (Exhibit 4); *id.* at 712-846 (Exhibits 50-68). In six of those matters, the complainants withdrew their petitions before, or did not appear for, a hearing on a final order. *Id.* At the time of Child's adjudication, Father was subject to a final order granting protection for four years in the seventh matter. *Id.*

Mother also had a PFA history. Two final orders were entered against her. N.T., 6/21/21, at 192 (Exhibit 1); *id.* at 205 (Exhibit 4); *id.* at 380-401 (Exhibits 31-33). The first was obtained by a family friend in 2012. *Id.* at 192 (Exhibit 1). The second was obtained in 2017 by Mother's former partner on his behalf and on behalf of Mother's child after he alleged Mother threatened him and neglected the child, and the child was covered in burns and had an infection. *Id.*

income;" and participate in supervised visitation with Child with appropriate interactions. N.T., 6/21/21, at 203 (Exhibit 4).

On September 24, 2021, ten months after BCCYS removed Child, the agency filed petitions seeking to involuntarily terminate the parental rights of Father and Mother. Both petitions sought termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (b). The orphans' court appointed Gary S. Fronheiser, Esquire, to represent Child,[5] Mary C. Favinger, Esquire, to represent Mother, and Emily B. Cherniack, Esquire, to represent Father.

The orphans' court conducted a hearing on June 21, 2021. BCCYS presented the testimony of its caseworker, Caitlyn Flemming. It also presented the testimony of the two service providers who conducted casework and/or parenting education sessions and supervised visits between Father, Mother, and Child: Vicky Acevedo, an employee of Partners in Parenting, and Cheri Kopycienski, a caseworker employed by Child & Family First. In addition, several individuals testified as expert and fact witnesses: Andrea

---

[5] Attorney Fronheiser served as Child's guardian *ad litem* (GAL) in his dependency case. In an order entered March 10, 2021, the orphans' court appointed Attorney Fronheiser as Child's legal counsel and GAL in the contested termination of parental rights matter. Notably, the order does not contain any indication that the orphans' court determined whether Attorney Fronheiser could represent Child without conflict. Nevertheless, because Child was less than two years old and his preference is unknowable, the Adoption Act does not require appointment of another lawyer to fulfill the counsel requirement set forth at 23 Pa.C.S.A. § 2313(a). *See In re T.S.*, 192 A.3d 1080, 1090 (Pa. 2018). Attorney Fronheiser submitted briefs in each appeal in support of affirmance.

Karlunas, a licensed clinical social worker with Commonwealth Clinic Group ("CCG") who conducted a domestic violence and mental health evaluation of Father; Julie Karaisz, who oversaw Father's domestic violence treatment at CCG; and Kenneth Terry Rohrbach, a psychotherapist who oversaw Mother's domestic violence treatment at CCG. In addition, BCCYS introduced, and the court admitted, 76 exhibits.[6] Finally, Father and Mother testified in their own defense.

At the conclusion of the hearing, the orphans' court took the decision under advisement. On August 18, 2021, the orphans' court entered decrees involuntarily terminating the parental rights of Father and Mother.

Father and Mother each timely filed a notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). The orphans' court issued one Pa.R.A.P. 1925(a) opinion addressing the claims of both parents.

At appeal number 1210 MDA 2021, Father sets forth two issues for our consideration.

> 1. Whether the honorable court erred as matter of law in terminating [Father's] parental rights based upon [BCCYS's]

---

[6] The exhibits included petitions and orders from Child's dependency matter; notes and reports authored by service providers regarding domestic violence, mental health, and other services provided to Mother and Father during the dependency; notes from service providers recording observations during visits; drug and psychiatric evaluations; urinalysis reports; criminal records and PFA records for Father and Mother; and paystubs. *See* N.T., 8/21/21, at 185-939 (Exhibits 1-76). The court admitted all of the exhibits without objection. *Id.* at 15, 25, 34, 55, 74, 100, 166.

presentation of evidence to meet its burden of proof pursuant to factors under 23 Pa.C.S.[A] § 2511(a)(1), (2), (5), and (8), without considering strides made by Father to remediate issues?

2. Whether the honorable court erred in finding the emotional bond between [Father] and Child would not have a negative effect on . . . Child if the parental bond was severed?

Father's Brief[7] at 4 (some capitalization omitted).

At appeal number 1211 MDA 2021, Mother sets forth two issues for our consideration.

1. Whether [BCCYS] failed to prove by clear and convincing evidence that [M]other's parental rights should have been terminated pursuant to 23 Pa.C.S.[A] § 2511(a)(1), (2), (5), and (8) since she had substantially completed her single case plan objectives as required to have . . . [C]hild returned to her?

2. Whether [t]here was a strong emotional and parental bond between [Mother] and . . . [C]hild which would have had a negative effect on . . . [C]hild if the parental bond was permanently severed?

Mother's Brief at 5.

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must

---

[7] Father's Brief refers to the brief he filed in his own appeal. On December 16, 2021, Father filed a letter brief in support of Mother in her appeal. Although we have reviewed it, we have no need to cite to it in this memorandum.

accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *In re Adoption of C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *In re Adoption of L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence,

which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.M.*, 255 A.3d at 359 (quotation marks and citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.*; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We begin with Father and Mother's first issues, which similarly address whether the orphans' court erred or abused its discretion in finding grounds to terminate their parental rights under subsection 2511(a), particularly in light of the efforts they have made.

Father argues that BCCYS's filing of a termination of parental rights petition against him was premature and fundamentally unfair. Father's Brief at 22-26. According to Father, the Covid-19 pandemic caused a delay in

services that prevented Father from being able to make progress. *Id.* Father contends BCCYS filed a petition against Father before they made reasonable efforts to reunify him and Child, claiming that BCCYS did not refer him to agencies or schedule services until after it filed the petition. *Id.* In Father's view, the pandemic is an environmental factor that was beyond his control and cannot be held against him pursuant to 23 Pa.C.S.A. § 2511(b).[8] *Id.* at 24-26.

Mother argues she was ready, willing, and able to care for Child at the time of the termination hearing. Mother's Brief at 11. She contends she made progress in addressing her mental health and substance abuse, notwithstanding some setbacks, and she was working with her landlord to address unpaid back rent. *Id.* at 12-13. She also echoes Father's argument that BCCYS should have afforded her more time to demonstrate progress due to the challenging conditions of the pandemic, stressing that BCCYS did not refer her to domestic violence treatment at CCG until after the agency filed the petition against her. *Id.* at 12.

The orphans' court offered the following analysis of Father and Mother's claims. Regarding Father, the orphans' court focused on his actions during

---

[8] As discussed further *infra*, Father refers to this portion of subsection 2511(b): "The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b).

visits, his inability or refusal to identify any skill he learned from services during his testimony, and the opinion of mental health and domestic violence experts that Father poses a risk to the health and safety of Child. Therefore, the court concluded that Father lacks the ability or desire to remedy the conditions that led to Child's removal. Orphans' Court Opinion, 10/18/21, at 22-23.

As for Mother, the orphans' court acknowledged Mother's visits with Child grew more appropriate over time, but it was concerned with her extensive absences and that Mother was still working on developing basic child-rearing skills despite this being Mother's sixth child. *Id.* Her lack of parenting skills, failure to visit consistently, ongoing struggles with mental health and substance abuse, and toxic relationship with Father led the orphans' court to conclude that Mother has not shown she has the ability or desire to remedy the conditions that led to Child's removal. *Id.*

BCCYS's petition was premised upon sections 2511(a)(1), (a)(2), (a)(5), and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child

- 11 -

to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (b).

We first consider whether BCCYS proved by clear and convincing evidence the existence of grounds pursuant to subsection 2511(a)(2).[9]

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Interest of D.R.-W.*, 227 A.3d 905, 912-13 (Pa. Super. 2020) *citing* **In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003).

"Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." **In re Adoption of A.H.**, 247 A.3d at 443. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **In re Z.P.**, 994 A.2d at 1118.

_____

[9] Neither the decrees nor the opinion of the orphans' court elucidates the specific grounds upon which it relies. Nevertheless, it is axiomatic that the petitioner needs to establish only one subsection of 2511(a) to proceed to subsection 2511(b), and we may affirm a decree based upon any valid reason appearing from the record. **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*). In its opinion, the orphans' court erroneously states that BCCYS sought termination under subsection 2511(a)(8), when neither petition included (a)(8). **See** Orphans' Court Opinion, 10/18/21, at 20-21. Father and Mother repeat the same misstatement. Father's Brief at 13; Mother's Brief at 9.

Grounds for termination under subsection (a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *Id.*

The orphans' court may also terminate the parental rights of a parent who has never had physical custody of a child. *Id.* at 1118.

> [W]hen a parent has demonstrated a continued inability to conduct his or her life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified.

*Id.* (*citing In re Adoption of Michael J.C.*, 486 A.2d 371, 375 (Pa. 1984) (OAJC)).

Our review of the record indicates that the orphans' court's findings have ample support. Father's mental health and risk for engaging in domestic violence remained a concern throughout Child's dependency. After evaluating Father on February 21, 2020, Andrea Karlunas, who testified as an expert in domestic violence and mental health, assessed Father's insight and judgment as poor. N.T., 6/21/21, at 19. Father often interrupted her, raised his voice,

and avoided her questions. *Id.* at 19-20. He deflected responsibility, blaming Child's removal on Mother's past behavior. *Id.*; *see also id.* at 622 (Exhibit 42). He minimized his own history, stating that any reports pertaining to violence were "false and defaming," blamed past PFA petitioners as "manipulative and mad," and claimed he had an "impeccable reputation" and raised his other children without issue. *Id.* at 622 (Exhibit 42).

Ms. Karlunas opined that Father did not appear to have the insight or ability to gauge a young toddler's needs or desires or to present as a calming factor, and further stated that she had some concerns about Father's presence around minors. *Id.* at 20. Father was unable to be redirected during the interview and his behavior escalated. *Id.* at 23. Notably, during her testimony at the hearing, Father interrupted, stating, "Am I supposed to believe this?" and left the courtroom. *Id.* at 20.

These concerns remained when Father underwent a psychological evaluation on January 26, 2021. Dr. Maria Ruiza Yee[10] diagnosed Father with Antisocial and Narcissistic Personality Disorder. N.T., 6/21/21, at 638 (Exhibit 44). By her assessment, Father exhibited "a pervasive pattern of disregard and violation of the rights of others." *Id.* Father lacked remorse and saw himself as a victim. *Id.* He exhibited "a pervasive pattern of grandiosity,

---

[10] Dr. Yee did not testify at the hearing, but BCCYS entered, and the orphan's court admitted, her report without objection. N.T., 6/21/21, at 166; *see also id.* at 628 (Exhibit 44).

- 15 -

needs for admiration, and lack of empathy." *Id.* He viewed himself as a "protector and savior," commenting that he is attracted to Mother "because she is weak and needs protection." *Id.* Dr. Yee appraised Father as "interpersonally exploitative." *Id.* at 639. Significantly, Dr. Yee opined that Father's personality traits render him unamenable to psychotherapy and present a barrier to treatment. *Id.*

The concerns of Ms. Karlunas and Dr. Yee echo concerns of Julie Karaisz, who provided Father with domestic violence treatment at CCG between late 2020 and early 2021. Although Father attended group and individual sessions regularly, after such sessions Father still was unable to acknowledge that he had a problem or articulate why he was involved with BCCYS. N.T., 6/21/21, at 27-30, 32, 40. Father presented with a lot of anger and inability to re-direct his anger. *Id.* at 31. In Ms. Karaisz's view, Father engages in denial, blame, and justification, and is desensitized to violence. *Id.* Father's level of denial and accountability was "zero" even after months of sessions. *Id.* at 33. His denial and lack of accountability posed significant barriers to his treatment, causing Ms. Karaisz to assess his prognosis as "poor" and "very limited." *Id.* at 30-31, 33, 40. Ultimately, Ms. Karaisz believed Father's mental health, namely his personality disorder, interfered with making progress in other areas of his life, and he needed sustained mental health treatment before he could address the other concerns in his life or be in a parental role. *Id.* at 41; *see also* 624, 627 (Exhibit 43).

The record indicates Mother also struggled with her mental health and substance abuse despite her efforts to stabilize. In the first evaluation on January 24, 2020, the evaluator diagnosed Mother with moderate/severe cannabis use disorder and moderate/severe alcohol use disorder, classified her as being in remission, and recommended that she attend dual-diagnosis treatment. N.T., 6/21/21, at 161; *see also id.* at 329 (Exhibit 25). Mother did not begin treatment, and she had a series of positive screens for THC in the fall of 2020. *Id.* at 161.

Mother began individual and group dual-diagnosis treatment to address substance abuse and her mental health at Berk's Counseling Center in November 2020. N.T., 6/21/21, at 321 (Exhibit 22). She completed intensive outpatient treatment on March 11, 2021. *Id.* at 324 (Exhibit 24). At that time, her counselor assessed her prognosis as good. *Id.* Around this same time, Mother underwent a second drug and alcohol evaluation. On March 8, 2021, the evaluator diagnosed Mother with other psychoactive substance use, and unspecified psychoactive substance-induced disorder, in remission, and recommended that Mother continue with biweekly individual sessions at Berk's Counseling Center. *Id.* at 161-163; *see also id.* at 331 (Exhibit 26).

However, according to Cheri Kopycienski, her caseworker at Child & Family First, Mother was experiencing depression between January and April 2021. N.T., 6/21/21, at 93; *see also id.* at 858-68 (Exhibit 71). Mother's depression, by her own admission to staff at Child & Family First, caused her

to miss casework and parenting sessions. *Id.* at 867. Mother was hospitalized in May 2021 after struggling with suicidal thoughts and severe anxiety. N.T., 6/21/21, at 52; *see also id.* at 869 (Exhibit 72).

During her testimony, Mother acknowledged having a "mental crisis" throughout May 2021, resulting in her being "in and out" of the hospital at two facilities. *Id.* at 122. She was released only three days prior to the hearing. *Id.* at 134. Mother reported not being able to keep food down and "going through a mental crisis where [she] didn't want to do anything." *Id.* at 123.

Mother was also undergoing treatment at CCG to address domestic violence concerns and her relationship with Father. She began working with Violet Emory in December 2020. Ms. Emory assessed Mother's progress as limited and her accountability to her current circumstances as poor. N.T., 6/21/21, at 316 (Exhibit 21). Ms. Emory indicated several ongoing risk factors for Mother, including her unresolved trauma, desensitization to violence, lack of a healthy support system, lack of skills, knowledge, and action to protect herself and children from violence, and financial dependance on Father. *Id.* at 318.

In March 2020, Mother transferred to Mr. Rohrbach, a psychotherapist at CCG, to accommodate Mother's work schedule. *Id.* at 49, 64. Mr. Rohrbach conducted four brief individual sessions with Mother through telehealth

between March and May 2021. *Id.* at 48-49. Sessions discontinued after Mother stopped answering Mr. Rohrbach's calls. *Id.* at 49.

Much like Ms. Emory's report, Mother's progress with Mr. Rohrbach was "[v]ery limited overall." *Id.* at 51. Based on Father's significant domestic violence history, Mr. Rohrbach had concerns about Mother's relationship with Father. *Id.* Mother denied problems in their relationship. *Id.* She spoke in a monotone voice regarding past events of trauma and reasons why she had been involved with BCCYS in the past. *Id.* at 53. This suggested to Mr. Rohrbach that Mother was desensitized to trauma and may not take steps to prevent, identify, or address abuse. *Id.* at 874 (Exhibit 72). In Mr. Rohrbach's opinion, Mother did not have the skills to be protective of Child and should not be in a caregiving role. *Id.* at 875. He believes Mother is in need of long-term treatment that could extend past the program's standard 26-week plan, and that she may not progress quickly enough to achieve all of the goals needed to reunify with Child. *Id.* at 65.

Regarding parenting, the record shows that Father and Mother made some progress in their basic skills, but they never progressed to unsupervised visitation. Vicky Acevedo, who supervised visits early in Child's dependency, did not have concerns about their parenting of Child as a young infant during the ten sessions she spent with them. N.T., 6/21/21, at 81. Nevertheless, she thought visits needed to remain supervised because "they were both new to the thing" and had outside issues to resolve. *Id.*

Ms. Kopycienski then began supervising weekly visits with the parents. *Id.* at 110. Initially, Father dominated the visits and Mother was more passive in her parenting. *Id.* at 95. Over time, this improved, and both were nurturing and engaging with Child. *Id.* Father and Mother both exhibited difficulties understanding appropriate child development; they sometimes had expectations of Child that were above his age range. *Id.* at 89.

Significantly, Father's ability to regulate his behavior during visits remained a concern. Father was resistant to suggestions; he would state that other people have told him he is a great dad and reference his other children. *Id.* at 91-92. After Ms. Kopycienski reported information to BCCYS that was not positive for Father, he refused to meet with her. Then, during a visit, he told Child not to look at Ms. Kopycienski and held a book in front of Child's face to block Child from looking at her. *Id.* at 94.

At a visit on May 19, 2021, Child had a bruise on his forehead. *Id.* at 106. Father was dissatisfied with the explanation from Child's foster mother that the bruise came from ordinary toddler play. Father escalated his demeanor, yelling and screaming close to Mother and Child, until he threw his phone onto the floor. *Id.* at 95-97. Father refused to discuss the incident after the fact and continued to focus on his blame of foster mother. *Id.* at 99. Mother sat passively even though she later told the caseworker that she was not concerned about the mark on Child's forehead. *Id.* at 97-98.

In Ms. Kopycienski's opinion, despite some progress with parenting skills, the need for supervision continued based upon the parents' limited understanding of child development, Father's anger, and Mother's passivity. *Id.* at 118-19.

Furthermore, their consistency was a concern. Both parents missed multiple sessions of parenting education without notice. *Id.* at 91. They also were inconsistent with visits. Between late March 2020 and August 2020, Father and Mother had no contact with Child, save for one visit in July 2020. N.T., 6/21/21, at 260-70 (Exhibits 14-16). Although they resumed attending visits around October 2020, they still cancelled, did not confirm, or did not show up for about half of the visits offered between October 2020 and June 2021. *See id.* at 269-73, 858-59, 879-80 (Exhibits 16-17, 71, 74).

Finally, Father and Mother's housing instability remained an issue. At the beginning of Child's dependency, Mother and Father were homeless and residing in separate homeless shelters. *Id.* at 70-71. They then moved into an apartment, but their landlord shut off their electricity when Father and Mother were behind on their rent. *Id.* at 85. Father and Mother were able to address most of the back rent by obtaining funding through pandemic relief legislation, but they continued to owe money on top of their rent to pay off the balance. *Id.* at 102. Ms. Kopycienski assisted Father and Mother with pursuing other housing but they have not followed through or showed up to all of the appointments. *Id.* at 103, 105.

In sum, both parents have demonstrated ongoing incapacities and/or refusals that have left Child without essential parental care throughout Child's dependency. Father has high conflict stemming from his personality disorder and has failed to reduce his risk of engaging in domestic violence. Mother has ongoing struggles with mental health and substance abuse. She remains in a relationship with Father, has not addressed her past trauma, and remains at risk of being unable to protect herself or Child. Father and Mother both continue to experience housing instability. They have not progressed past supervised visits and are not close to reunifying with Child. Father's and Mother's problems are long-standing and permeate most facets of their lives, and both are either unwilling or unable to change and eliminate the instability that renders them unsuitable for parenting Child. Thus, the orphans' court did not err or abuse its discretion in terminating their parental rights pursuant to subsection 2511(a)(2). **See In re Z.P.**, 994 A.2d at 1117-118.

Neither Father's nor Mother's arguments persuade us to the contrary. Regarding their arguments as to the agency's provision of reasonable efforts, we acknowledge that the provision or omission of efforts can be relevant to a termination of parental rights petition, particularly relating to a parent's ability to change or remedy circumstances. **See In re D.C.D.**, 105 A.3d 662, 675 (Pa. 2014). However, even if an agency did not provide reasonable efforts, the orphans' court may still opt to terminate parental rights. **Id.**

Nothing in the certified record shows that the agency failed to make reasonable efforts in this case. We observe that at the permanency review hearings on May 12, 2020, October 6, 2020, January 26, 2021, and March 2, 2021, the juvenile court made a finding that BCCYS engaged in the provision of reasonable services. *Id.* at 209-54 (Exhibits 7-10). There is no indication that Father or Mother ever challenged these findings.

In their briefs, Father and Mother attempt to paint a picture where the agency ignored them until after it filed the petitions and where the pandemic interfered with their ability to work towards reunification. *See* Father's Brief at 22-26; Mother's Brief at 12. In a vacuum, Father's and Mother's arguments that the agency prematurely filed the petition amid pandemic restrictions and before it offered services sound compelling. But these arguments are not borne out by the certified record. Instead, the record demonstrates that Father and Mother had the information they needed to begin services, but they neither engaged with services nor remained in contact with BCCYS or service providers.

In a letter dated March 4, 2020, BCCYS provided contact information for the caseworker, as well as for scheduling random urinalysis and mental health and domestic violence evaluations at CCG. *Id.* at 282 (Exhibit 18). Around this same time, the records from Open Door International indicate that Father and Mother began declining case work sessions in late February 2020 and early March 2020, stopped appearing for visits, and did not remain in contact

with their caseworker. *Id.* at 262 (Exhibit 14). Notably, this failure to remain in contact pre-dated the institution of any widespread pandemic restrictions.

BCCYS sent another letter to Father and Mother on June 22, 2020, indicating that the caseworker had been unable to reach them on the telephone numbers Father and Mother had provided to her. *Id.* at 283. Nevertheless, Open Door International's records show Father and Mother's failure to remain in consistent contact continued. *See id.* at 265 (Exhibit 15). As noted *supra*, Father and Mother did not take advantage of opportunities to visit with Child virtually, and went from February to July without having contact with him at all. *Id.* at 265 (Exhibit 15). Even after re-starting visits in July 2020, Father and Mother repeatedly failed to confirm visits, and only saw Child four times between July 13, 2020 and October 15, 2020. *Id.* at 269 (Exhibit 16).

Thus, while the pandemic has undoubtedly put challenges in place for everyone, Father and Mother fail to convince us that it was BCCYS or the pandemic that created barriers to work on reunification prior to BCCYS's filing of the petition.

Moreover, while Father and Mother emphasize the timing of the petition's filing, under subsection (a)(2) and (a)(5), the orphans' court is permitted to consider parental efforts that occur post-petition. *See* 23 Pa.C.S.A. § 2511(b). It is clear from the opinion of the orphans' court that it did, in fact, do so. As detailed above, the orphans' court had ample evidence

before it that Father and Mother's incapacities were too numerous and significant to overcome. Even assuming for the sake of argument that any delay in service referrals was attributable to BCCYS, the testimony of the various providers detailed above indicates that this delay did not cause Father and Mother's downfall. Thus, we reject Father and Mother's arguments that the orphans' court terminated their parental rights solely on the basis of environmental factors beyond their control. *See* 23 Pa.C.S.A. § 2511(b). Likewise, we reject their arguments that their efforts were enough to remedy their incapacities and they should have been afforded more time while Child remained in foster care. *See In re Z.P.*, 994 A.2d at 1117-118.

We turn now to Father and Mother's second issues, which both address the orphans' court's analysis under subsection (b). *See* 23 Pa.C.S.A. § 2511(b) ("The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child").

"The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that section 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Parental rights may be terminated notwithstanding the existence of a parent-child bond. When

examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *Id.* Furthermore, a parent's love of a child, alone, does not preclude a termination. *See In re: L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007).

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The *T.S.M.* Court directed that, in

- 26 -

weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In the instant case, although Father sets forth an issue in his concise statement and his statement of questions presented regarding Child's needs and welfare pursuant to subsection 2511(b), he does not include any argument addressing Child's needs and welfare. Failure to develop such an argument in the argument section of a brief renders it waived. *See In re: M.Z.T.M.W.*, 163 A.3d 462, 465-66 n.3 (Pa. Super. 2017). Even if Father had not waived his challenge to subsection 2511(b), we would find it lacked merit for similar reasons as to why we ultimately reject Mother's challenge.

Mother's argument is exceedingly brief. She argues BCCYS failed to prove its petition under subsection 2511(b) because she and Child share a bond. Mother's Brief at 14. To support this contention, Mother asserts that she was nurturing and appropriate during all visits, even if her visits were inconsistent. *Id.* at 15. This argument fails to convince us that the orphans' court erred or abused its discretion in terminating Mother's parental rights under subsection 2511(b). *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) (holding orphans' court properly protected bond between child and foster mother as opposed to attenuated bond between child and his mother

forged during irregular visits); *In re T.M.T.*, 64 A.3d 1119, 1128 (noting children's enjoyment of snacks and fun time during a supervised visit "does not rise to the level of a parent-child bond").

Child has never been in Mother or Father's care. He came into foster care at birth. He remained in foster care at the time of the termination of parental rights hearing a year and one-half later. He has spent most of his life with his foster mother, only visiting with Mother and Father sporadically. N.T., 6/21/21, at 260-73, 858-59, 879-80 (Exhibits 14-17, 71, 74). His foster mother is a long-term resource for Child. *Id.* at 160-61. Child is bonded with his foster mother, is comfortable in his surroundings, and looks to her for all his needs. *Id.* at 160, 175. Under these circumstances, we concur with the orphans' court conclusion that termination of Mother and Father's rights would not have a negative effect on Child and, at this point in Child's life, would inure to his benefit to provide him with security, love, and stability with his foster mother, who meets his needs and functions as his parental figure. Orphans' Court Opinion, 10/18/21, at 10, 23. Accordingly, no relief is due.

Having found that the orphans' court did not err or abuse its discretion in terminating Father and Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b), we affirm the decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>03/24/2022</u>